MILLER, J. pro tem.
This is an action for damages arising out of a collision between an automobile owned and driven by Charles E. Moore, and a 105 Milimeter Howitzer gun mounted on a two-wheel carrier, towed by a 2% ton GMC truck belonging to and being operated on the highway by members of the Louisiana National Guard. After trial of the case on the merits, judgment was rendered in favor of Moore and his guest passenger Johnnie Elam and the State of Louisiana has appealed.
The State of Louisiana is made the sole defendant on the allegation that the vehicle towing the howitzer with which petitioners collided was a part of a Louisiana National Guard convoy, which fact is admitted, and the further allegation that the vehicle at the time of the collision was being operated by the Louisiana National Guard, an agency of the State of Louisiana. This latter allegation was denied in the pleadings by the defendant, but the evidence amply proves that ownership and operation.
Plaintiffs were authorized to institute this suit against the State of Louisiana by Act 214 of 1958. The Act was passed and the suit filed and tried prior to the 1960 Amendment to Article III, Section 5 of the Louisiana Constitution, LSA. Exceptions to the jurisdiction of the Court ratione personae and materiae, and of no right and no cause of action were filed by the defendant. These have been abandoned in view of the holding of Fullilove v. United States Casualty Co. of N. Y., La.App., 129 So.2d 816, certiorari denied June 22, 1961, that the above cited constitutional amendment operated retrospectively.
Subsequent to the judgment granted by the trial court and while this appeal was pending, Shirley Mae Bellard Elam filed a motion addressed to this court alleging that she was married to the plaintiff Johnnie Elam, Jr. in 1954; that the community of acquets and gains existed from that date until March 18, 1960, subsequent to the date that Johnnie Elam, Jr. obtained judgment against the State of Louisiana from the trial court; that the community was dissolved on March 18, 1960 by virtue of a judgment of separation from bed and board, and the parties were finally divorced on March 30, 1961; that certified copies of the marriage certificate and: judgment of divorce were being made a part of the pleadings; and that she is for these reasons the absolute owner in her own right of an undivided one-half interest in and to the claim asserted herein by Johnnie Elam, Jr., and accordingly desires to be permitted to join as a co-plaintiff in this cause.
Johnnie Elam, Jr. does not oppose the joinder of his divorced wife as a party plaintiff, for the apparent reason that the damages recovered for the husband’s injuries suffered during the existence of the community fall into the community. McHenry v. American Employers’ Ins. Co., 206 La. 70, 18 So.2d 656. The only opposition filed or argued by the State is in the nature of an exception on the following grounds: That Act 214 of 1958 cannot be construed as authorizing or permitting the substitution or addition of parties plaintiff in the instant suit; that before Mrs. Elam can be recognized as a party plaintiff she must first obtain permission from the Legislature to sue the State in her own behalf. *753 The defendant has not cited any authority for this position and we know of none.
By Act 214 of 1958, the Louisiana Legislature authorized institution of suit on the cause of action asserted herein and waived its immunity as to that cause. Johnnie Elam, Jr. was the only person who had a right to assert that cause of action at the time the legislation was adopted, at the time the suit was filed and at the time the judgment was rendered and signed. The circumstance that Mrs. Elam is now recognized as being the owner of one-half of the previously existing community and suffers no legal disability in exercising her right to claim one-half of the assets of the community, does not alter the fact that the State has waived its immunity as to this very cause of action. The substitution or addition of the proper parties who have the right to assert the cause of action is purely procedural and in no way requires an additional legislative act.
Where a disability which existed during the proceedings in the trial court has now been removed, it is not necessary for this court to remand the case to the district court in order to permit the proper party to be joined. See Standard Tile & Marble Co. v. Gray, La.App., 85 So.2d 356, where a trustee in bankruptcy was substituted as a party plaintiff; Patrick v. T. Smith & Sons, La.App., 58 So.2d 353, where two children who became of age during an appeal were substituted as parties plaintiff in lieu of their tutrix; and Reconstruction Finance Corporation v. Mickelberry, 205 La. 463, 17 So.2d 628 where the judgment of the trial court had been sold pending the appeal and the purchaser, on motion, was substituted as a party plaintiff.
According to our analysis of the pleadings, evidence and briefs, the following issues remain to be considered:
(1)Was the operator of the National Guard truck guilty of negligence which was a proximate, cause of the accident?
(2) Did the State properly raise the issue of contributory negligence, and if so, were the plaintiffs guilty of contributory negligence ?
(3) The quantum.
The accident occurred on August 18, 1957, at about 1:50 o’clock A.M. on U. S. Highway 190 in West Baton Rouge Parish, at a point about one and one-half miles, west of the Mississippi River bridge. Highway 190 at this point is a level four lane highway with the two eastbound traffic lanes being separated from the two westbound traffic lanes by a neutral ground estimated as being about 10 feet wide. The evidence shows that the four traffic lanes were concrete with a very gradual curve to the south (to the right for eastbound traffic). The curve was described as being so gradual that it would take approximately half a mile to make a turn of 100 feet. There was a good shoulder to the right side of the concrete of an estimated width of about 10 to 12 feet. The weather was clear prior to and at the time of the accident. There were several restaurants or nightclubs located in the vicinity of the accident, two of which were on the south side of the highway. One was west and one east of the site of the accident.
Paul J. Thibodeaux, who was traveling in an easterly direction, was driving the truck which towed the howitzer involved in this accident. His unit was one of a convoy returning from field training exercises at Fort Polk, near Leesville, Louisiana, proceeding to Jackson Barracks at New Orleans. As the convoy approached the Mississippi River bridge the commanding officer received notice of some obstruction on the bridge and proceeded to stop the convoy to inform the drivers of all vehicles of this development. Thibodeaux, and presumably all of those preceding him, stopped in the right lane of traffic. This left the left, or passing, lane open to traffic and it also left open the right, or south, shoulder. Thibodeaux testified that he had stopped for a period of 30 seconds to 10 *754 minutes prior to the accident. Considering all of his testimony, we conclude that he was parked on the highway for at least five minutes before the occurrence of the accident. In the convoy behind Thibo-deaux, there were at least three vehicles and howitzers similar to Thibodeaux’s unit and several jeeps. Ahead of Thibodeaux there were approximately eight similar vehicles and howitzers and several other military vehicles.
Although the State vigorously maintains that the units behind Thibodeaux were following at a distance of approximately 100 yards, the evidence conclusively sustains the finding of the trial court that Moore had passed the vehicle which was supposed to be immediately behind Thibo-deaux a distance of at least one-half mile west of the accident. Although there is no evidence from any of the military personnel riding in the following vehicles, the convoy speed was supposed to be 30 miles per hour and it is presumed that these vehicles were being operated at that speed.
At the time that Moore passed the vehicle which was supposed to be immediately behind Thibodeaux, Moore thought that he had passed all of the convoy and therefore moved from the passing lane to the right or outside lane, and continued to operate his vehicle at a speed of 50 miles per hour. Suddenly Moore saw a dark patch in front of him. He was so surprised and so near the object that he doesn’t remember taking any evasive action or applying his brakes. However; considering the relatively minor damages to Moore’s 1956 Ford it is apparent that Moore was traveling less than 50 miles per hour when he struck the howitzer. Moore’s Ford came to rest with the muzzle of the howitzer protruding through the windshield.
Mounted on its carrier, the howitzer extended from the rear of the 2% ton truck a distance almost as great as the length of the truck itself. The truck, gun and carrier were painted the usual Army olive drab color with a dull finish. Such a color and finish blends perfectly with the darkness of the night and absorbs but does not reflect the lights of an approaching car. Neither the tail light nor the reflectors on the rear end of the 2% ton GMC truck were visible to overtaking traffic for the reason that the howitzer shield and carrier completely blocked the view. The only light which could be seen by an overtaking vehicle was a “blackout light” strapped to the muzzle of the howitzer. The testimony is uniformly to the effect that this blackout light shows a dim light not remotely approaching the type of light usually given off by the tail light of a truck or automobile. The testimony preponderates in favor of a holding that the blackout light is visible for a maximum distance of 75 feet. Taking the testimony most favorable to the State, the blackout light would be visible for a distance of 75 to 100 yards. However, when this witness was asked to indicate how far it was to the back of the courtroom he testified that it appeared to him to be a little farther than 75 to 100 yards. On further questioning he amended his estimate of the distance to the back of the courtroom to somewhere between 25 and 50 yards. The distance was stepped off and the record shows the actual distance to the back of the courtroom was 12 to 13 steps. The blackout light on the howitzer towed by Thibodeaux had a white lens on it instead of the red lens which was in all of the blackout lights on the other vehicles. We find that the dim white light visible for a maximum distance of 75 feet and mounted approximately 4jd> feet above the road gives no warning to overtaking traffic.
There was a red reflector of a diameter of three to four inches mounted in the muzzle of the gun and facing overtaking traffic, but it is not even suggested by the State that this complies with the requirements of LSA-R.S. 32:293 which requires taillights visible for a distance of 500 feet.
There were no clearance lights on any of the National Guard vehicles in this con *755 voy. Neither were there any flares or reflectors available for- posting on the highway to warn traffic that the vehicles were parked on the highway. No attempt was made by Thibodeaux or any of the men riding in the passenger section of his track to warn overtaking traffic of the fact that their vehicle was parked on the highway.
The rays from Thibodeaux’s headlights did not give any warning of the presence of Thibodeaux’s truck and howitzer for the reason that Thibodeaux was parked within a foot or two of the vehicle ahead of him and, if his headlights were burning at all, the flood of light to be expected from Thibodeaux’s headlights was hidden and obstructed by his close proximity to the front vehicle.
From the foregoing, it is clear that Thi-bodeaux’s truck and howitzer were in violation of numerous provisions of the highway regulatory act, including LSA-R.S. 32:241 (prohibiting parking on the traveled portion of the highway), LSA-R.S. 32:280 (requiring a red light visible for 500 feet from the rear when any part of the load extends beyond the rear bed of the vehicle), LSA-R.S. 32:293 (requiring taillights visible for a distance of 500 feet), LSA-R.S. 32:294 (requiring clearance lights on trucks), LSA-R.S. 32:313 (requiring parked or stopped vehicles on the highway to display lights) and LSA-R.S. 32:441 (requiring trucks to set out flares or reflectors visible for 500 feet upon bringing their vehicle to a stop upon or immediately adjacent to the traveled portion of the highway). We agree with the holding of the trial court that these acts constituted gross negligence and were a proximate cause of the accident.
We must next consider the affirmative defense of contributory negligence plead by the State in the following manner:
“Article 16. In the alternative, and only in the event the Court should find negligence on the part of the operator of the National Guard vehicle, defendant specially pleads contributory negligence in bar of recovery by plaintiffs.”
To make a charge that there was-, contributory negligence is to charge a conclusion of law, and unless there are facts, alleged from which a legal conclusion may be drawn, the charge is without effect.. Delta Fire and Casualty Co. v. Bird, La. App., 121 So.2d 375; Service Fire Insurance Co. of New York v. Indiana Lumbermans Mutual Insurance Co., La.App., Ill So.2d 158. The defendant argues that since all of the evidence was admitted without any objection on the part of the plaintiffs,, the pleadings were enlarged. In answer to this contention, we are in accord with the statement of the law in the Service-Fire Insurance case, supra, set forth at 111 So.2d at page 362:
“We are well aware of the jurisprudence to the effect that ordinarily evidence touching issues not raised by the pleadings and received without objection effectively enlarges the pleadings to the extent that it is to be considered an issue in the case. But this rule does not obtain where the evidence in question is responsive to the pleadings and admissible thereunder and could not have been successfully objected to.”
Here the defendant is contending that Moore failed to keep a proper lookout. Im our view, most of the testimony on the-question of Moore’s lookout was responsive to the plaintiff’s pleadings and admissible-thereunder and did not enlarge defendant’s pleadings. The exceptions to this, would be the lines of testimony having to.do with the fact that Moore had his headlights on low beam immediately prior to-the accident, and the testimony by Moore- and Elam that each had two cans of beer during the two hours prior to the accident.
Moore’s failure to have his headlights on high beam does not constitute con- *756 tributary negligence. Although there is no testimony that Moore was confronted with blinding headlights from oncoming cars, the record is clear that there was a great deal of traffic on the highway that night. Moore had been changing his headlights from high beam to low beam to accommodate traffic before reaching the area near the site of the accident. His testimony stands unquestioned and we hold that Moore had his lights on low beam for some time prior to the accident so as not to interfere with oncoming traffic, and presumably so that the oncoming traffic would keep their lights on low beam for his benefit. We are of the opinion that under these circumstances it was entirely proper for Moore to have his headlights on low beam. This in turn accounts for the fact that Moore could not see the red reflector mounted in the muzzle of the howitzer. See Gaiennie v. Cooperative Produce Company, Inc., 196 La. 417, 199 So. 377.
The record is bare of any suggestion that the two beers affected Moore’s driving. The investigating officer testified that he talked at length with Moore after the accident and did not find him under the influence. The Doctors who gave emergency treatment to Elam found no suggestion of intoxication. We find this particular point similar to one in the case of Rizley v. Cutrer, 232 La. 65S, 95 So.2d 139. In that case, the driver of a vehicle was in his proper lane of traffic when struck by an oncoming car which crossed into his lane of traffic. The court concluded that the fact that the driver had consumed one beer and one bourbon and soda made no difference, for it would be “most unrealistic” to conclude that plaintiff could extricate himself from the emergency created when the oncoming car crossed into his lane. While we do not have the case of an oncoming car crossing into Moore’s lane of traffic, we do have the principal lane of travel of one of the busiest U. S. Highways in Louisiana blocked with a truck and howitzer which if not exactly camouflaged, were almost camouflaged. To be confronted with this unbelievable situation created by the Louisiana National Guard is an emergency which fits the rule of the case of Byrd v. Elliott, La.App., 108 So.2d 248, 250:
“The issue of law which is presented by this appeal must be resolved in accordance with the generally enunciated and accepted rule of liability which attaches to motorists, resulting in a conclusion of responsibility for collisions with the rear end of preceding vehicles on a public highway, or it must be considered as falling under the equally well established exception to the general rule as exemplified in that line of cases beginning with Gai-ennie v. Cooperative Produce Co., Inc., 196 La. 417, 199 So. 377; reiterated, inter alia, in Rea v. Dow Motor Co., La.App., 36 So.2d 750, and Lynch v. Fisher, La.App., 41 So.2d 692. Specific factors which are taken into consideration in classifying a case under the exception have been denominated as the locality, the position of the vehicles, the nature of their construction and the operation and effect of lighting equipment. Measuring the application of the facts established in the instant case it must be observed that defendant’s speed was reasonable, his lights were dimmed in consideration of the flow of approaching traffic, the locale of the accident was on the open highway, no warning lights were visible from the rear of the other vehicle, and the construction of such vehicle was clearly of that unusual skeletal character which, in itself, constitutes an unexpected hazard upon the public highway.
“In view of these factual conclusions we think there can be no question as to the appropriate conclusion to the effect that the accident must be classified under the exception to the general rule of negligence and, accordingly, it follows that the defendant (operator of the overtaking ve- *757 hide) must be exonerated from a finding of negligence.”
With regard to the quantum of damages, the plaintiff has not answered the appeal and the defendant has contented itself with the following argument:
“ * * * defendant submits that the damages awarded in this case are excessive. The head injury which the plaintiff, Johnny Elam, Jr., received turned out to be of minor consequence. He was not in need of any additional medical treatment at the time .of the trial of this case in the Lower Court; indeed, he quit reporting to his doctor for further examination before his doctor finally discharged him.”
With regard to the failure of Elam to return to his physician for a scheduled visit Elam testified that he was embarrassed to continue seeking medical treatment when he already owed over $3,000 in medical bills which he could not pay.
We are in complete accord with the awards made by the learned trial judge and take the liberty of quoting from that portion of his opinion wherein he discusses the award of damages.
“Moore was in the hospital only one day. Dr. Jerome Tanna examined him and had x-rays made. The Doctor’s diagnosis was that Moore suffered trauma to his lower chest and abdomen. The x-rays were negative in all particulars. Moore said his knees, arms and chest were bruised and his short ribs were sore for three or four weeks. Though he went back to work after two weeks he still suffered considerable pain for two or three weeks longer. He lost two weeks wages of $150.00, paid $47.50 hospital expenses and $650.00 for the repair of his automobile. In addition to these items he will be allowed $500.00 for his personal injuries.
“Plaintiff Elam was taken to the hospital that night in an ambulance. He remained in a semi-coma for some days. X-rays disclosed that the accident caused a compound fracture of the mandible to the left of the symphysis and a compound fracture at the right angle of the mandible. The fragment between these fractures was displaced about three-quarters of an inch toward the tongue. There was also a fracture of the right zygoma and zygomatic arch with depression of the zygoma.
“Dr. Coffee performed an open reduction on the anterior mandibular fracture and inserted a metal plate with four screws. Stainless steel wires were used to pull the broken parts into position. There was marked oral occlusion of the teeth due to the fractures, and the teeth were held in position by wires and finally the teeth in a fracture line had to be removed because of loss of vitality. The jaw was immobilized for about a month. In these operations Elam was under general anaesthetic and the operations consumed some three hours.
“In addition to the fractures mentioned above, Elam sustained a depressed skull fracture in the frontal region adjacent to and behind the right eye with concussion. The accident left Elam with a depressed skull causing pressure on the brain. The damaged portion of the bone had to be removed. This left a soft place formerly protected by bone and it will remain possibly susceptible to easier injury. An electro-encephalogram showed abnormally slow brain activity following the operations. The frontal scar of about four or five inches and the soft area are clearly noticeable to the eye and touch. Dr. Edelman performed the skull operation. Dr. Tanna saw Elam in the emergency room at the hospital when Elam was brought in and *758 found him in shock. Dr. Tanna saw him twice a day during the time of his hospital confinement. Dr. Tanna pronounced his injuries severe.
“Elam’s hospital chart is in evidence and examination of this document discloses the numerous entries made by the nursing staff in attendance at all hours of the days and nights as to his restlessness and pain and the administration of sedatives.
“Elam, as a witness in his own behalf, did not exaggerate his injuries. He says now that his jaw is still not right; that there is some pain up to the date of the trial a year and a half after the accident, and that there is some impairment of his vision. Dr. Edelman said the impairment of vision could be the result of a disturbance of the optic nerves by the injuries; at least, that would be a consistent conclusion.
“It is my opinion that $12,000.00 would be a reasonable award to this plaintiff Elam for his personal injuries. Dr. Tanna’s bill was $175.00; Dr. Edelman’s bill was $406.00; Dr. Coffee’s bill was $452.00; the hospital bill was $474.50; this plaintiff lost six months wages at $75.00 a week or a total of $1,800.00. These special damages will be allowed.
“For these reasons there will be judgment in favor of 'the plaintiff Moore for $500.00 for personal injuries and $697.50 for loss of wages, property damage and hospital expenses, and judgment in favor of plaintiff Elam for $12,000.00 for personal injuries and $3,307.50 for loss of wages, hospital and medical expenses, together with legal interest thereon on all these amounts, and against the State of Louisiana, with the expert witness fees of $50.00 each to Dr. Tanna, Dr. Edelman and Dr. Coffee, to be taxed as costs * * * ”
Mrs. Johnnie Elam, Jr., divorced wife of the plaintiff Johnnie Elam, Jr., is recognized as entitled to one-half of the judgment awarded to Johnnie Elam, Jr., and with this amendment, the judgment of the trial court is affirmed.