175 So.2d 697 (1965)
V. J. McMORRIS
v.
HANOVER INSURANCE CO. et al.
Mrs. Ann M. FINCH
v.
EMPLOYERS MUTUAL OF OMAHA et al.
No. 6398.
Court of Appeal of Louisiana, First Circuit.
May 24, 1965.
*698 Walker P. Macmurdo, of Percy, Macmurdo & Gray, William H. Brown, of Howell, Lipsey & Brown, Baton Rouge, for appellants.
Ben W. Lightfoot, of Durrett, Hardin, Hunter, Dameron & Fritchie, Robert J. Vandaworker, of Taylor, Porter, Brooks, Fuller & Phillips, Baton Rouge, for appellees.
Before ELLIS, LOTTINGER, LANDRY, BAILES, and KEARNEY, JJ.
KEARNEY, Judge pro tem.
These two cases, consolidated below for trial only, arose out of the same automobile collision which occurred in the City of Baton Rouge on September 10, 1962, shortly before 6:30 p. m.
Mr. Eugene F. Finch, with his wife, Mrs. Ann M. Finch, as a passenger, was driving a 1960 Rambler Station Wagon easterly on Government Street, a four-lane street with a width of 44 to 45 feet. As he turned *699 left into a driveway of the Colonial Motor Lodge, a residential motel where he rented a unit, his station wagon was struck on the right side by a 1957 Pontiac which was being driven westerly on Government Street by V. J. McMorris.
McMorris filed suit against Eugene F. Finch and his insurer, Hanover Insurance Company. The plaintiff's collision insurer, American Bankers Insurance Company of Florida, intervened in that suit for $400 representing the portion of the damages to the McMorris vehicle which it had paid in accordance with its policy in excess of the deductible of $50.00.
Mrs. Ann M. Finch filed suit against her husband's liability insurer, Hanover Insurance Company, and against McMorris and Employers Mutual of Omaha. The latter insurance company was alleged to be the liability insurer of the McMorris vehicle; however, Employers Mutual of Omaha made no appearance. In his answer McMorris alleged that his liability insurer was actually Employers Mutual Liability Insurance Company of Wisconsin, but the plaintiff did not amend her pleadings to join that company, and the suit proceeded to its conclusion against McMorris alone.
Finch did not sue or reconvene against McMorris for the damages to his station wagon.
In McMorris v. Hanover Insurance Company, judgment was rendered and signed rejecting the demands of the plaintiff and the intervenor and dismissing the plaintiff's suit and the intervention. McMorris has appealed. The intervenor has allowed the judgment dismissing its claim to become definitive without appeal.
In Finch v. Employers Mutual of Omaha there was judgment rejecting the plaintiff's demands and dismissing her suit. Mrs. Finch has appealed.
The district court gave no written reasons for the judgments and oral reasons are not reported. Therefore, except for certain gratuitous references in some of the briefs filed in this court adverting to the judge's comments, we do not know the basis of the decision. Mrs. Finch, it will be noted, was a guest passenger, and her failure to recover could result only from a failure to prove that either driver was guilty of negligence proximately causing the accident (an unlikely possibility dependent upon the availability and reliability of evidence) or that the guest passenger was guilty of independent contributory negligence (a rather limited concept). The dismissal of the McMorris case may have resulted from a failure to carry the burden of proving negligence on the part of Finch as a proximate cause of the accident or from a conclusion that McMorris was contributorily negligent.
The questions presented are substantially factual, and must be resolved from conflicting and rather cursory testimony regarding the accident.
Mr. Finch testified that he slowed down to 10 or 20 miles per hour and changed to low gear when he approached a point opposite the driveway. He had his left-turn signal on. He looked eastward or straight ahead, and noted that the traffic light at the "Foster Avenue intersection was red, which protected me." He saw no cars approaching and proceeded with his turn. He never saw the McMorris vehicle until after the collision which occurred when all four wheels of the Finch station wagon were on the driveway off the street. According to Mr. Finch the Foster Drive intersection was 580 feet east of the driveway apron.
Mrs. Finch corroborated her husband's testimony. She was watching for traffic also and noted that the light at the intersection was red. She did not see the McMorris car until immediately before the impact, but she insisted that the McMorris vehicle was traveling without lights. Mr. Finch testified that he did not stop before turning, but Mrs. Finch said he came almost to a stop if not a complete stop.
Both Mr. and Mrs. Finch deduced that Mr. McMorris must have been traveling at a great rate of speed based upon the fact *700 that he was not in sight at the time they looked down the street.
There is a disagreement among the witnesses as to the point of impact. The Finch car was struck on the right front door from the corner post to the front of the rear door. Mr. and Mrs. Finch contend that their vehicle was off the street when it was struck, after the complete negotiation of the turn. Mrs. Finch's niece, Mrs. William Bohannon, and her husband, testified that they happened upon the scene shortly after the accident, and that the station wagon had all four wheels on the driveway with only the back end extending into the street. The McMorris vehicle had its two front wheels and right rear wheel in the driveway off the street. Mr. Bohannon testified that there was broken glass in the driveway, which he assumed came from the headlights of the McMorris vehicle. Mrs. Bohannon testified that she noticed a broken or intermittent skid mark on the curb beginning about sixty feet east of the driveway extending to the point of impact. She speculated that the skid mark was made by the right wheels of the McMorris vehicle. She could not explain how the car came to rest straddling the curb if the mark made by the right wheels was on the curb.
J. W. Smith, the City Policeman who investigated the accident, testified that the McMorris vehicle left 70 feet of light skid marks in the street which marks appeared to veer slightly to the right and ending at the curb line where the car came to rest. There were two parallel skid marks, both in the street. The point of impact, according to the officer, was on the north parallel line of Government Street at the entrance to the Colonial Courts.
According to Mr. Smith, the speed limit was 40 miles per hour.
Mr. McMorris testified that he was on his way to the Medical Department of Ethyl Corporation to have drops put in his eye caused by a welding arc flash burn. (There is no suggestion that his eyesight was affected.) He was traveling on the right or northernmost lane of traffic about 35 or 40 miles per hour, with his lights on. Mr. Finch was approaching on the inside lane for eastbound traffic. When McMorris was 20 or 30 feet or more east of the driveway, Mr. Finch turned into the path of the approaching McMorris vehicle. Mr. McMorris was obviously incorrect in his estimation of the distance, because he left 70 feet of skid marks. McMorris testified that he immediately applied his brakes, but that he was unable to avoid the collision. The front of his car came into contract with the Finch vehicle and was knocked over against the curb. When the collision occurred, according to Mr. McMorris, the Finch vehicle was entirely in the street. After the accident the front wheels were a foot or two into the driveway.
There is some uncertainty about the degree of darkness at the time of the accident. The streetlights, which are set to go on automatically when natural light diminishes to the degree usually obtaining about twenty minutes before dark, were lit. Although Mr. Finch stated that the day was cloudy, and visibility was affected thereby, the preponderance of the testimony is that visibility was good. Mr. James A. Stelly, supervisor of commercial and lighting sales for Gulf States Utilities Company, with impressive qualifications in the field of street lighting and personal knowledge of the lighting of the particular street involved in this case, testified in detail. His testimony may be summarized with the conclusion that Government Street at that time and place was very well illuminated, and that a normal person looking eastward from the point of the collision at night could see a car far beyond the Foster Drive intersection 580 feet away. It is apparent that Mr. Finch should have seen the McMorris vehicle approaching. Mr. and Mrs. Finch attempt to explain their failure to see the McMorris vehicle on the dual basis that McMorris was traveling without lights, and that he was traveling at such a great rate of speed that he was not yet in sight when they looked. *701 This theory is not supported by the evidence. There is nothing at all to indicate that McMorris was operating his automobile at an excessive rate of speed.
The impact was not a forceful one, since both cars simply stopped in position. McMorris testified that he was traveling 30 to 40 miles per hour. The seventy-foot skid marks are consistent with a speed of 40 miles per hour or less. See 9C Blashfield Cyclopedia of Automobile Law and Practice, 413, § 6237, where the skid distance for 40 miles per hour is listed as 71 feet. See also Am.Jur.2d Desk Book, Doc. No. 176, p. 456, where the stopping distance after application of brakes at 40 miles per hour is 90 feet. In accord see Am.Jur.2d Desk Book, Docs. 172, 173 and 174(3), pp. 452-454. These figures necessarily are exclusive of the distances travelled during perception and reaction. Furthermore they will vary according to the effective coefficient of friction, which depends upon such factors as the weight of the car, the size of the tires and their gripping efficiency, and the surface of the road. Nevertheless the charts show that McMorris must have travelled from 77 to 88 feet, after Mr. Finch began his turn, prior to the brakes becoming operational. This is referred to as perception and reaction distance. There is nothing in the record to indicate that McMorris should have or could have avoided the collision by applying his brakes sooner or by swerving left instead of right. He was confronted with an emergency, and he was committed to a skid in the northernmost lane of travel at the moment he jammed his brakes 70 feet away. A motorist faced with a sudden emergency, not of his own creation, is not held to the same degree of care and calm judgment ordinarily demanded of a motorist, and he will not be penalized for failure to make the wisest selection of all possible evasive measures. Romans v. New Amsterdam Casualty Co. et al., La.App., 137 So.2d 82. Whether the point of impact was on or off the street is immaterial in this case. Finch had to cross two lanes of traffic. McMorris could only guess whether it was best to apply his brakes forcefully, or whether he should veer to the left in the hope that Finch would have time to clear the left lane. His reaction took the form of one possible evasive measure. He cannot be penalized for not selecting the one which we now believe may have avoided a collision.
Mrs. Finch's testimony reveals an unusual eagerness to sustain her husband's freedom from responsibility for the accident, resulting in the question of her own independent contributory negligence. She was so anxious to establish that she was looking out for traffic as to characterize herself a "good helping driver," or as others might put it, a back-seat driver. Also she was very reluctant to admit that her husband had not come to a complete stop before attempting to turn although her husband readily admitted it. This eagerness on her part will necessitate our serious consideration of her responsibility hereinafter. We do not believe Mrs. Finch had sufficient opportunity to observe whether the McMorris car had its lights on, because it is obvious she did not see the oncoming vehicle until the instant before impact.
We conclude therefore that the McMorris vehicle had its lights on and that Finch should have seen the McMorris car and permitted it to pass before he attempted to turn. We find no contributory negligence on the part of McMorris.
It is well established that a motorist is charged with having seen that which he should have seen through the exercise of ordinary care. McGee v. Southern Farm Bureau Casualty Ins. Co., La.App., 125 So.2d 787; Dennison v. Southwestern Fire and Casualty Co., La.App., 124 So.2d 421; Romans v. New Amsterdam Casualty Co. et al., La.App., 137 So.2d 82.
A left turn is a hazardous maneuver and before attempting it, a driver must ascertain that it can be negotiated safely without interfering with normal overtaking and oncoming traffic. Hudgens v. Mayeaux *702 et al., La.App., 143 So.2d 606; United States Fidelity and Guaranty Co. v. Bergeron, La.App., 148 So.2d 162; Shepherd v. Robin, et al., La.App., 152 So.2d 285. See also LSA-R.S. 32:104, subd. A.
We find no error in the judgment dismissing the claims of Mrs. Finch against V. J. McMorris. The judgment dismissing the claims of V. J. McMorris against Hanover Insurance Company and E. F. Finch must be reversed. The damages suffered by McMorris will be discussed hereinafter.
It is urged that the claims of Mrs. Finch should be rejected as against all parties because she was guilty of contributory negligence. Contributory negligence of a guest passenger is recognized in our law under very limited circumstances. Counsel for Hanover Insurance Company direct our attention to a portion of the following quotation from Lockhart v. Missouri Pacific Railway Company, La.App., 153 So. 577:
"* * * And in Corpus Juris, vol. 45, p. 1016: `While negligence of the driver of a vehicle is not ordinarily imputed to an occupant who neither has nor exercises the right to control the driver in the management of the vehicle, it is nevertheless the duty of the occupant to exercise ordinary care to avoid injury. In other words, he is obliged to exercise such care as an ordinarily prudent person, riding with another, would exercise for his own safety under the same or similar circumstances. If he fails to exercise such care, and his failure to do so concurs with the actionable negligence of defendant and contributes to the injury complained of as a proximate cause, he is guilty of contributory negligence. * * * Recovery is denied to the occupant in such cases because of his own negligence, and not by virtue of the doctrine of imputed negligence. Ordinary care, however, is all that is required. It is, of course, essential, in order that an occupant may be guilty of contributory negligence, that his failure to exercise ordinary care to avoid injury contribute as a proximate cause to the injury complained of.'
"And in discussing the right of the guest or idle occupant of the car to implicitly rely upon the driver's skill and competency as an operator, it is said:
"`But an occupant of a vehicle may not abandon the exercise of his own faculties and entrust his safety absolutely to the driver, regardless of the imminence of danger, or the visible lack of ordinary care on the part of the driver to avoid harm. It is his duty to exercise ordinary care to protect himself from known dangers and perils which the attendant circumstances suggest.
"`While an occupant of a vehicle is not required to exercise the same watchfulness as the driver, it is his duty to exercise ordinary care, including a reasonable use of his faculties of sight, hearing and intelligence, to observe and appreciate danger or threatened danger of injury, and if he fails to do so, and such failure contributes to the injury complained of as a proximate cause, he is guilty of contributory negligence. However, it cannot be said that it is the duty of an occupant of a vehicle to use his senses in order to discover approaching vehicles and other dangers in every case and under all circumstances. Ordinary care to observe and appreciate danger is all that is required.' Corpus Juris, vol. 45, p. 1017, §§ 567 and 568."
In addition to the foregoing quotation we believe the pertinent law is properly explained in Herget v. Saucier, 223 La. 938, 67 So.2d 543, where the Court said:
"Generally, a guest passenger is not required to keep a constant lookout for *703 the dangers of the highway, or to pay attention to the ordinary road and other traffic conditions incident to automobile driving, it being his right and privilege to place reasonable reliance upon the driver in charge of the car for the exercise of the necessary care and caution. Of course, if he is aware of a danger ahead which apparently is unknown to the driver, or if he observes that such driver is incompetent or otherwise unfit to operate the machine, a duty devolves upon him to take some precautionary action. White v. State Farm Mutual Automobile Insurance Co., 222 La. 994, 64 So.2d 245 [42 A.L.R.2d 338] (and authorities cited in both dissenting opinions thereof)."
In White v. State Farm Mutual Automobile Ins. Co., 222 La. 994, 64 So.2d 245, 249, 42 A.L.R.2d 338, the Supreme Court, said:
"* * * But in determining whether the asserted fault of a guest has been a contributing factor in bringing about his injuries, it is first necessary to ascertain what duties are imposed upon him as pertain to the operation of the vehicle and the safety of the journey. It is firmly established by the above cited authorities of this Court and others of the Courts of Appeal of this State, too numerous to mention, that a guest is under no duty to supervise the driving of the vehicle and he is not obliged to look out for sudden or unexpected dangers that may arise. Albeit, he has the right to place reliance upon the driver to discharge that obligation and, as aptly expressed by the Court of Appeal, Second Circuit, in Singley v. Thomas [La.App.], 49 So.2d 465, 469, `* * * is not required to monitor the operation or to pay attention to the road and other traffic conditions' in the absence of a showing that he has actual or constructive knowledge that the driver is incompetent or unfit to operate the vehicle.
"On the other hand, the jurisprudence has imposed upon the guest an obligation to avoid an accident or injury to himself under certain conditions. That duty has been tersely said by this Court, in Delaune v. Breaux, supra [174 La. 43, 139 So. 753], to exist in cases where the guest `* * * is aware of the fact that there is danger ahead, which apparently is unknown to the driver or may be unknown to him, or where a sudden or unexpected danger arises to the knowledge of the guest, apparently not observed by the driver * * *.' 174 La. at page 47, 139 So. at page 755. In such situations, it is incumbent on the guest to warn the driver of the danger and, if he fails to do so at a time when the driver is able to avert it, his dereliction may be said to be a contributing cause of any injury he may sustain."
Therefore it appears that a guest passenger has a duty to warn the driver or otherwise protect himself when he is aware of a danger which is apparently unknown to the driver or may be unknown to him or where a sudden or unexpected danger arises to the knowledge of the guest, apparently not observed by the driver. To these limited situations, counsel suggest, must be added those cases where the guest passenger should have been aware of a danger, even though he did not actually see it and was not aware of it. Particularly, counsel suggest, this is true where the guest passenger undertakes to assist the driver by watching for traffic. We can not extend the rule to that degree. Only if the guest passenger were to lead the driver to believe that he would watch for traffic and explicitly undertake to warn the driver of oncoming cars, so that the driver is falsely lured into a position of danger, could the passenger be charged with a duty to see what he should have been by the exercise of reasonable care and diligence. (Of course, even in such cases, the driver is not absolved from his obligation to keep a lookout, because our law does not recognize any division of labor in the operation of a motor vehicle. The primary responsibility always remains with the driver, who receives *704 a license from the State for the privilege. No licenses are issued to guest passengers.)
There is no evidence that Mrs. Finch told her husband that there was no approaching traffic, or that her husband was depending upon her by agreement to keep a lookout. She did not lure him into the position of danger. Furthermore, she was not aware of the danger until it was too late. She shouted "Gene," when she saw the Pontiac, but the collision occurred instantly before her husband could react.
The fact that Mrs. Finch looked down the street in the same direction that her husband looked, and saw everything he saw, does not render her guilty of contributory negligence for failing to see what her husband should have seen. We do not find Mrs. Finch guilty of contributory negligence. It is necessary therefore to consider the extent of her injuries.
Mrs. Finch was examined by Dr. Charles McVea on September 11, 1962, and on four other occasions, the last time on October 15, 1962. She had suffered a contusion or bruising of her right hand and her right hip and flank and several brush burns. Dr. McVea found that she suffered painful and to some degree disabling injuries which prevented her from attending to her usual activities, but by October 15, 1962, she had recovered sufficiently to require no further medical attention. Dr. McVea conceded that the injuries were severe enough to be accompanied by a complaint of back trouble, but Mrs. Finch had no such complaints when he saw her.
A year and a half later, Mrs. Finch went to see Dr. James F. Halley, on April 24, 1964, some eight months after her suit was filed. Dr. Halley diagnosed a muscle strain, largely on the basis of subjective complaints. He felt the strain was subsiding and should continue to do so.
Mrs. Finch testified she stayed away from work for about a month and a half, and that she was still in pain when she returned to work. Her neck and back had been hurting her, and she still had trouble with her back at the time of the trial. Mrs. Finch's testimony is not substantiated by the medical testimony. If Mrs. Finch was indeed suffering back pains at the time of the trial, she failed to carry the burden of proving that they were caused by the accident. The long period of time which transpired between her last visit to Dr. McVea and her visit to Dr. Halley is totally unexplained and inconsistent with a continuing injury. We believe Mrs. Finch will be adequately compensated for her injuries by a judgment in her favor for $500 against her husband's insurer, Hanover Insurance Company. See Eubanks v. Wilson, La.App., 162 So.2d 842; Moore v. State, La.App., 136 So.2d 751.
As to the damages claimed by V. J. McMorris we can dispose of the property damage first. It is contended that judgment should be rendered for the stipulated amount of $450, $50 payable to Mr. McMorris and $400 payable to his insurance company. However, as we have previously pointed out, American Bankers Insurance Company of Florida chose to intervene in this suit. Although notice of the judgment rejecting the intervenor's demands was duly served, the intervenor did not appeal. We are powerless to disturb that part of the judgment. There will be judgment in favor of V. J. McMorris for $50 for property damage.
After the accident investigation, Mr. McMorris went to the Medical Department of Ethyl Corporation, and had his eye treated. He returned home, and shortly thereafter, according to Mr. McMorris, he collapsed. His wife and son helped him into a car and took him to the Baton Rouge General Hospital whence he called his physician, Dr. Thomas Campanella. Dr. Campanella testified that he examined Mr. McMorris at the hospital and there was no evidence of any neurological abnormality of the upper extremities or head injury. Nevertheless, because the patient was complaining of a headache and there was a possibility of a cerebral concussion, Mr. McMorris was admitted *705 to the hospital for observation and X-rays of the skull were taken. Subsequently X-rays of the cervical spine, lumbosacral spine and the chest were taken, because of the complaints of chest pains, pain in the lower back and pain and soreness of the neck. All of the X-rays were negative. Although Dr. Campanella apparently found no objective symptoms, Mr. McMorris remained in the hospital from September 10, 1962 to September 18, 1962. On September 21, Mr. McMorris went to Dr. Campanella's office, complaining of pain and weakness across the back and pain of his lower extremities and weakness of his legs. In addition he complained of pain and stiffness in the neck, and pain in the right side of his chest. Dr. Campanella found some rigidity or tightness of the neck muscles and tightness of the back muscles. He recommended the use of traction to relieve the spasm of the neck muscles, and, to relieve the spasm and tightness of the lower back, a lumbosacral corset was prescribed.
In this regard it is noted that Mr. McMorris suffered two accidents in 1959, and received settlements therefor, which he persisted in forgetting, sometimes denied, and which he admitted only after vigorous cross-examination. The previous accidents are significant because they resulted in complaints of precisely the same nature as those complained of in the present case, and it appears that since 1959 Mr. McMorris has had to use cervical traction periodically at home. He was hospitalized in August, 1961, and on October 9, 1961, for neck traction. Mr. McMorris, in fact, has a long history of neck trouble. In July, 1955, he had been admitted to Baton Rouge General Hospital for cervical traction for an "old" injury. Mr. McMorris has had a "back condition" at least since 1959.
On September 22, 1962, Mr. McMorris reported to the hospital with complaints of pain in the epigastric region. He was treated by Dr. Gordon Peak. There is nothing in the record to indicate that these complaints were related to the accident. On September 24 he went to Dr. Campanella's office again complaining of headaches and chest pains. Dr. Campanella sent him to an internist, Dr. Jacob Faust, but nothing appears in the record concerning Dr. Faust's findings. On September 28, 1962, Mr. McMorris was sent back to work on light duty, and on October 1, 1962, Dr. Campanella recommended his return to work on full duty. He was still wearing a lumbosacral brace.
On December 5, 1962, Mr. McMorris visited the doctor's office again, for pain in the back and things. Because of Dr. Campanella's absence, Dr. Means examined him, and advised the continued use of the back brace. Dr. Campanella examined him the following day with negative results except for some tenderness over the "sacrum or the sitting bone." On January 17, 1963 he again complained of pain, and the examination was negative.
Seven months later Mr. McMorris complained of back pain and suggested that if there was any surgical procedure to alleviate the pain it should be considered. Five days later, on August 27, 1963, Mr. McMorris was hospitalized for four days for traction.
Dr. Campanella saw Mr. McMorris on occasion thereafter, but no objective findings were discovered. On the strength of Mr. McMorris's subjective complaints of pain, and his complaint of inability to perform all his work, Dr. Campanella felt the only thing that could be done for Mr. McMorris would be to fuse his back in the lumbar region. This operation would cost approximately $2000 including hospitalization expenses, and would take about a year for full recuperation. Mr. McMorris testified that he planned to have the operation performed in July of 1964. Although he was prepared to perform the operation, Dr. Campanella conceded that there were absolutely no objective findings to substantiate a diagnosis of back injury necessitating a fusion operation.
Dr. Campanella diagnosed the condition as a lumbosacral strain, which he characterized as less serious than a sprain.
*706 Dr. Charles Cracraft, an orthopedic surgeon, examined Mr. McMorris on April 22, 1964, at the request of defendant's counsel. X-rays were made. Dr. Cracraft's examination revealed no objective findings, and he diagnosed a strain simply on the basis of the "history" given him by the patient.
It is a settled principle of law that a tortfeasor takes his victim as he finds him, and that the claimant may recover for damages consisting of the aggravation of a previously existing condition.
It is equally well settled that a plaintiff in a tort suit carries the burden of proving his damages by a preponderance of the evidence. In this connection he must prove that any injuries complained of are causally related to the accident or tortious act.
In the present case we conclude that plaintiff has proved only that he suffered a muscular strain necessitating hospitalization the first time. Dr. Campanella could not definitely testify with regard to the causal connection between Mr. McMorris's present condition and the accidental injury.
Plaintiff, McMorris, will be permitted to recover the following special damages: hospitalization, $307.70; Dr. Campanella's fees, $220.00; Dr. Faust, $45.00; Snell's Limbs-Braces, Inc., $106.56; Drugs, $28.63, for a total of $707.89 in special damages. No recovery will be allowed for the remaining items which are not causally connected with the accident of September 10, 1962. Loss of wages was not proved, since it appears Mr. McMorris continued to receive his pay while he was away from work, under sick pay provisions of the union contract. For his pain and suffering, judgment will be rendered in favor of Mr. McMorris for $1,000.00. Judgment will therefore be granted in favor of Mr. McMorris and against The Hanover Insurance Company, for $1,707.89, plus $50.00 for property damages.
In the case of Mrs. Ann M. Finch v. Employers Mutual of Omaha et al., judgment dismissing her suit against V. J. McMorris and Employers Mutual of Omaha is affirmed. Judgment rejecting her demand against Hanover Insurance Company will be reversed and judgment rendered in her favor against Hanover Insurance Company in the sum of $500.00, together with legal interest at the rate of 5% per annum from date of judicial demand, until paid, and all costs.
In the case of McMorris v. Hanover Insurance Company, et al., judgment rejecting said plaintiff's demand is reversed and judgment rendered in favor of said plaintiff, V. J. McMorris, and against said defendants, Hanover Insurance Company and Eugene F. Finch, in solido, for the sum of $1,757.89, together with legal interest thereon at the rate of 5% per annum from date of judicial demand, until paid, and all costs.
Affirmed in part, reversed in part and rendered.