Manuel Santos Rivera y Otros, demandantes, recurrentes, y recurridos, *v.* Nelson S. Quiñones de la Rosa y Otros, demandados, recurridos y recurrentes.

Números: R-63-283    Resueltos: 29 de abril de 1966
R-63-285

*Rafael Pastor,* abogado de los demandantes-recurrentes y recurridos; *Rieckehoff, Calderón, Vargas & Arroyo,* abogados de los demandados-recurridos y recurrentes; y *Héctor Martínez Muñoz,* abogado de Commercial Insurance Company.

Sala Segunda integrada por el Juez Asociado Señor Belaval como Presidente de Sala y los Jueces Asociados Señores Santana Becerra, Blanco Lugo y Ramírez Bages.

El Juez Asociado Señor Ramírez Bages emitió la opinión del Tribunal.

El día primero de abril de 1962 ocurrió un accidente en el kilómetro 56.5 de la carretera Núm. 1, a unos 35 metros de la intersección que forma la llamada Ave. Barbosa de Cayey

con la carretera en cuestión, con motivo del cual sufrieron graves lesiones los ocupantes de un vehículo Plymouth conducido por Juan Rivera Cintrón, muriendo uno de ellos llamado Wilfredo Santos Carrasquillo. También sufrieron lesiones el conductor de un vehículo Pontiac y otros de sus ocupantes. El accidente consistió en el violento choque de estos vehículos en el sitio indicado. Concluyó el tribunal de instancia que el accidente se debió exclusivamente a la negligencia de ambos conductores al abandonar sus respectivos carriles dando lugar a que ambos vehículos chocaran en el centro de la carretera, estimando el grado de negligencia de cada uno en 50%. Determinó la cuantía de los daños sufridos por cada lesionado, la naturaleza de los cuales fue estipulada por las partes, y la redujo a la mitad y responsabilizó a los recurridos por los daños sufridos por los ocupantes del Plymouth y al conductor de éste, el recurrente Rivera Cintrón, por los daños sufridos por el conductor del Pontiac. Nelson S. Quiñones de la Rosa, los que éste reclamó en reconvención.

No conformes ambas partes recurrieron ante nos. Los primeros apuntan que el tribunal de instancia erró (1) al concluir que Rivera Cintrón "contribuyó en un 50% con su negligencia al accidente"; (2) al aplicar para rebajar sus daños la norma de negligencia comparada; (3) al fijar los daños de Rivera Cintrón en sólo $4,000; (4) al declarar con lugar la contrademanda del Sr. Quiñones de la Rosa; (5) al fijar en una cuantía inadecuada los daños sufridos por los otros ocupantes del Plymouth; y (6) al reducirlos en 50% cuando estos recurrentes-recurridos no incurrieron en negligencia alguna. Por otra parte, apunta Quiñones de la Rosa que el tribunal de instancia incurrió en error en la apreciación y aquilatación de la prueba y sus conclusiones de hecho no representan el balance más justiciero y razonable de la evidencia sometida.

A los fines de resolver, es necesario hacer un análisis y resumen de la prueba pues el caso gira alrededor de si fueron

negligentes ambos conductores, o sólo uno de ellos, al desviar sus vehículos de sus respectivos carriles mientras eran conducidos en direcciones opuestas. El tribunal de instancia en sus conclusiones de hecho no hizo una determinación detallada sobre las circunstancias que justificaron su conclusión de manera que no indicó causa o razón alguna que motivase los movimientos de cada uno de los vehículos antes del accidente.

Testificó Rivera Cintrón que cuando salió de ver a su novia en Cidra, a eso de las 10:30 de la noche, lo llamaron desde la plaza los otros recurrentes-recurridos y le pidieron dar una vuelta en el Plymouth que él conducía; que salieron en dirección a Caguas; que pararon varias veces a hacer necesidades y a hacer chistes; que pararon en el restorán La Mina de Oro para comprar gasolina; que allí hicieron turno por una media hora pues uno de los muchachos fue a buscar al que se encarga de despachar la gasolina; había otros tres o cuatro también esperando por lo que tuvieron que hacer turno; que luego se dirigieron a Cayey; que la entrada de la Ave. Barceló [*sic*] que va desde la carretera Núm. 1 a Cayey, donde la carretera Núm. 1 es recta, "Como allí han habido accidentes yo me abrí un poco a la izquierda casi pegado a la línea blanca". Siguió testificando Rivera Cintrón que el Pontiac venía por el carril que le correspondía hasta que se le atravesó muy ligero; que el impacto ocurrió como a tres segundos de desviarse él ligeramente hacia su izquierda; que el impacto ocurrió en la parte derecha, o sea en su carril. En ese sitio la carretera hace una semicurva. El testigo declaró que "porque aquella es una semicurva, ahí fue que cogí la misma semicurva . . . a la izquierda"; que se desvió a la izquierda, pegado a la línea, frente a frente a la intersección; vio el Pontiac como a 80 metros "caminando normalmente por su carril". Al preguntársele si en el preciso momento que se desvió a la izquierda se desvió el Pontiac a la izquierda de él contestó que "Cuando me desvié a la izquierda

voy a buscar a ponerme al medio, entonces se me atravesó". Negó que un policía interviniera en una discusión entre el encargado de despachar gasolina en La Mina de Oro y el testigo y sus compañeros. No vio policía por allí.

Félix Norberto Torres, otro de los ocupantes del Plymouth, testificó que al llegar a la referida intersección "el carro de nosotros se metió al centro de la carretera pegado a la línea blanca, entonces después se dirigió al centro del medio"; "se pegó a la línea blanca y después volvió al centro de nuevo de la carretera"; "tres segundos por ahí venía el otro carro y se atravesó en el medio". Este testigo iba en el asiento de atrás del Plymouth con otros tres de los jóvenes que lo ocupaban. Testificó que miraba por el lado de otros dos de los tres que iban en el asiento del frente, por entre los dos; sabía que iban a 45 millas porque vio el "marca millas momentos antes del accidente"; que otro de los ocupantes Julio Vega, olía a licor; que en el puesto de gasolina había 4 carros. Cuando se le preguntó si algún policía habló con ellos en La Mina de Oro, contestó que "conmigo nadie habló en La Mina de Oro".

El mecánico que recogió los vehículos después del accidente, testificó que el "Plymouth yendo de Cayey quedó a la parte izquierda. La parte delantera un poco fuera de la carretera". Estaba mirando para el cañaveral "a un grado [*sic*] de 45 grados con respecto a la línea blanca de la carretera". El Pontiac "estaba al lado contrario . . . lado derecho yendo de Caguas a Cayey. Entonces estaban con la parte delantera mirando hacia la izquierda de la carretera . . . Caguas a Cayey". Los vehículos quedaron en direcciones opuestas.

Las fotografías de los vehículos participantes en el accidente demuestran que ambos vehículos quedaron destrozados. El Plymouth quedó con su frente totalmente destrozado y el otro con todo su lado derecho hecho añicos.

El Dr. González Anon testificó que "Por la apreciación, por la inspección de los pacientes [se refería a los recurrentes-recurridos] no noté que dieran indicios evidentes ni percibí

alcohol en ninguno de ellos; no recuerdo que estuviesen [*sic*] aliento de intoxicación alcohólica". Declaró que cuando el grado de intoxicación que presenta un paciente es cosa evidente, ellos (en el Centro de Salud de Cayey) anotan el hecho en el récord en el cual no aparece tal anotación. Pero añadió que si habían tomado una o dos cervezas él no lo podía decir; que lo que podía manifestar era que no recordaba "que por su comportamiento, ninguno de los heridos presentase comportamiento de un borracho bien intoxicado"; que esta afirmación se basaba en una apreciación visual y no en exámenes de sangre u orina.

Rafael Rivera Vázquez, empleado del garage del restorán La Mina de Oro testificó que los recurrentes-recurridos llegaron allí en el Plymouth después de las once de la noche. Negó que tuviesen que hacer turno porque no habían otros vehículos allí. Les vendió dos galones de gasolina. Tuvo que llamar al policía Maldonado porque no le querían pagar. Dijo que los ocupantes del Plymouth unas veces estaban quietos y otras veces alborotaban. Notó que estaban tomando porque "yo sé cuando una persona se da tragos . . . . Al llegar allí pegaron rápido y la actitud de unos con los otros . . . . Parece que estaban en alguna fiesta o iban para alguna fiesta". Luego que el policía les amonestó, pagaron y se fueron. En contrainterrogatorio declaró que no los vio tomando; que estaban tomando "por la forma, por la actitud esa de ellos que no querían pagar . . . . De que estaban hablando . . . cualquier persona que esté tomando de aquí a ahí se nota". Al preguntársele si se notaba por el aliento contestó que sí. No pudo decir si el conductor del Plymouth, Rivera Cintrón estaba tomando.

Ángel Martínez del Valle, quien viajaba en el asiento del frente en el Pontiac, conducido por Quiñones de la Rosa, testificó que "Desde que pasamos el cruce de Cayey, diría como unos momentos después venía un automóvil frente a frente a nosotros con la luz deslumbrante y el señor Quiñones

[el conductor del Pontiac] dijo: 'Mira Martínez lo que viene' y vi por los focos venían para encima de mí". El Pontiac procedía por el carril derecho, o sea, por su derecha, a unas 45 millas por hora. Continuó testificando que "De momento vimos el automóvil que salió de momento como en una semicurva y él me dijo eso 'qué es lo que pasa' y de momento yo pensé que no había para donde desviar porque estaba obscuro a la derecha, no se veía bien y él optó por desviar"; que Quiñones de la Rosa redujo la marcha, aplicó los frenos, tocó la bocina pero no pudo pararse, "echó a la izquierda e inmediatamente yo mentalmente aprobé lo que hizo . . . para evitar porque venía hacia nosotros". El Plymouth se les presentó a cien o a ciento cincuenta yardas. Añadió que el accidente fue antes de llegar a la intersección que se llama Avenida Barceló viniendo de Cayey a Caguas.

Mariano Díaz, conductor de un automóvil que seguía al Pontiac ocupado por personas del mismo grupo que los del Pontiac, testificó que al llegar a la Central Cayey él venía como "a cuatro o cinco carros de distancia de . . . Quiñones"; que "Vi que venía en dirección opuesta un vehículo por el carril que nos pertenecía a nosotros con las luces deslumbrantes puestas . . . venía bien rápido porque el accidente ocurrió con esa rapidez . . . algo asombroso. El Sr. Nelson Quiñones tocó bocina". Dijo que tanto Quiñones de la Rosa como él redujeron la velocidad; que "él [Quiñones de la Rosa] trató de evitar el accidente, pero era imposible y trató de cortar . . . un poquito a la izquierda pero en ese momento el otro también cortó para su derecha y ocurrió el impacto . . . . En el carril derecho, o sea, que nos pertenecía a nosotros . . . hacia la derecha. . . . Yo diría, que fue en la línea blanca que divide". Declaró que el Plymouth también "me dio a mí y me dejó paralelo al carro de Nelson Quiñones"; que desde que vio el Plymouth por primera vez y el impacto "Diría que fue cosa de segundos". Añadió que el Plymouth quedó

mirando hacia Guayama en el carril derecho por donde el testigo venía.

El recurrido-recurrente Nelson Quiñones de la Rosa declaró que una hora u hora y media antes del accidente se tomaron una o dos cervezas; que luego de pasar el cruce de Cayey-Guayama "pero antes de llegar a una semicurva que hay, que hay una entrada para Cayey sufrimos un accidente . . . por ese sitio mencionado, ahora, por el carril derecho, yo de momento noto al salir de la media curva un carro, digo carro porque lo que veo son dos focos, por mi carril. Venía de frente hacia mí y en ese momento hay como una pequeña subida, una pequeña elevación . . . . Quité el pie del acelerador porque venía el carro hacia mí y comenté: 'ese hombre está loco, por el carril de nosotros' y ahí mismo al terminar la conversación traté de esquivar el golpe tratando de salir para evitar el impacto y ahí mismo, al mismo tiempo el carro me dio". En contrainterrogatorio declaró que vio un paseo de peatones en el lugar del accidente y un carro parado allí a la derecha suya que notó después del accidente. Al preguntársele si sus luces alumbraban hacia los lados contestó que tenían un ángulo de visión, insistió que su vehículo (el Pontiac) fue impactado "a un ángulo" y no atravesado.

Apuntan los recurrentes-recurridos que la teoría del accidente expuesta por los recurridos-recurrentes es falsa porque (1) el Plymouth quedó en el carril del Pontiac, su parte delantera en la misma posición o dirección en que iba a ocurrir el accidente pero algo sesgado en un ángulo; la parte delantera un poco fuera de la carretera; (2) las averías de ambos carros demuestran que el Pontiac no podía estar ligeramente sesgado al encontrarse con el Plymouth pues en tal caso la abolladura de aquél no sería profunda hacia dentro como lo es, sino a todo lo largo de su costado derecho y la del Plymouth sería en su frente derecho y no uniforme a todo lo ancho de su frente; (3) la colisión no pudo haber ocurrido en el carril del Pontiac ya que éste no pudo haber girado en un

eje dentro de ese carril para en ese carril recibir un impacto profundo y hacia dentro y en su mismo centro producido por el frente del Plymouth. Si fuera cierto que Quiñones de la Rosa estaba en su carril y que desvió y fue chocado en su carril a su izquierda en ese momento, hubiera recibido el impacto a un ángulo leve a todo lo largo de su lado derecho. Por otro lado, el Plymouth no hubiera sufrido en todo su frente y no hubiera permanecido, o parado, en el carril de Quiñones de la Rosa y hubiera parado dentro del cañaveral o fuera de la carretera, mucho menos si iba a gran velocidad. El Pontiac tuvo que haber girado desde su carril, súbitamente, describiendo un semicírculo hacia el otro carril, exponiendo su costado derecho a un ángulo de por lo menos 45° al frente total del Plymouth hacia el carril de éste. Sostienen los recurrentes-recurridos que por lo tanto el accidente tuvo que ocurrir en la forma expuesta por sus testigos; que "es mucho más probable que Quiñones de la Rosa cometió un error de juicio" inducido por la maniobra que realizó el conductor del Plymouth al desviar hacia su izquierda aunque dentro, de su carril, acercándose peligrosamente al carril del Pontiac sin haber reducido su velocidad al hacer tal maniobra, hecho que interpretó erróneamente el conductor del Pontiac quien desvió a su izquierda súbitamente invadiendo en cerrado ángulo el carril del Plymouth al creer que éste invadiría el carril del Pontiac; que por lo tanto Quiñones de la Rosa fue exclusivamente responsable del accidente.

A nuestro juicio debemos determinar cuál es el balance más racional, justiciero y jurídico de la totalidad de la evidencia que no contravenga el orden natural de las cosas ni el orden racional de la inteligencia humana. *Sanabria* v. *Sucn. González*, 82 D.P.R. 885, 997 (1961).

Convenimos con el tribunal de instancia en que ambos conductores desviaron los autos de sus respectivos carriles. Pero como no hizo determinación alguna de por qué actuaron así, es necesario que la hagamos nosotros a los fines de resol-

ver si uno o ambos de los conductores fueron negligentes, cuestión que es determinante de la responsabilidad de las partes.

La prueba demuestra que los ocupantes del Plymouth eran unos adolescentes, en plan de fiesta; que en algunos de ellos se notó en La Mina de Oro que habían ingerido alguna bebida alcohólica y uno de ellos testificó que otro de ellos olía a licor; que en su testimonio incurrieron en inexactitudes en relación con el incidente de comprar gasolina en el lugar antes mencionado, incidente que requirió que un policía interviniese para apaciguarlos. En su testimonio tanto el conductor del Plymouth como su acompañante se cuidaron muy bien de no rebasar los límites de ley en cuanto a la conducción del vehículo por el lado requerido de la carretera y el límite de la velocidad prescrita por ley. Pero se deduce de los destrozos que sufrieron los vehículos y las lesiones de sus ocupantes, que uno o ambos vehículos debieron conducirse a una velocidad muy en exceso del límite de ley. *Valedón* v. *Fernández*, 78 D.P.R. 257 (1955); *Efret* v. *Quiñones*, 40 D.P.R. 192 (1929). Se deduce también de la prueba que ni el Pontiac ni el otro automóvil que lo acompañaba eran conducidos a velocidad excesiva al ocurrir el choque; que éstos eran conducidos y ocupados por personas mayores, casados y de responsabilidad y que, por el contrario, redujeron la velocidad al aparecérseles el Plymouth por el carril en que ellos transitaban. Creemos que dentro de las circunstancias, es forzoso concluir que era el Plymouth conducido por Rivera Cintrón el que era conducido a una velocidad excesiva. Por otra parte, las actuaciones de los recurrentes-recurridos, y el hecho de que la desviación de su vehículo ocurrió en una semicurva, justifica concluir que esa desviación rebasó la línea blanca de la carretera y que en efecto Quiñones de la Rosa, y los otros ocupantes del Pontiac y del automóvil que le seguía observaron al Plymouth acercarse rápidamente por el carril ocupado propiamente por el Pontiac. Nos queda por

resolver si ante esta súbita emergencia actuó Quiñones de la Rosa razonablemente al desviarse a la izquierda cuando de haberlo hecho hacia su derecha quizás hubiera evitado el accidente al seguir por el paseo de la carretera. Evidentemente en los tres segundos antes del accidente, que fue todo el tiempo de que dispuso Quiñones de la Rosa para resolver cómo evitar el accidente, fue razonable ante la súbita e inesperada emergencia que le surgió, que no girase a la derecha, pues como testificó Martínez del Valle, quien iba al lado de Quiñones de la Rosa en el Pontiac "estaba obscura la derecha, no se veía bien y él [Quiñones de la Rosa] optó por desviar". Por el contrario, Quiñones de la Rosa en ese momento tenía vista clara de la carretera expedita a su izquierda. Era razonable que asumiese, al acercársele el Plymouth a gran velocidad por el carril por donde transitaba él, que lograría eludirlo desviándose por la izquierda pero en el firme de la carretera. En ese momento no era razonable para Quiñones de la Rosa el anticipar que el conductor del Plymouth habría de desviarse también hacia su propio carril, de manera que, al desviarse ambos, impactara el Plymouth al Pontiac de lleno y a fondo por su costado derecho. Es cierto que Quiñones de la Rosa dijo que vio un paseo de peatones en el lugar del accidente y un automóvil parado en la tierra a su derecha pero indudablemente esto lo supo luego del accidente pues declaró enseguida que lo supo "después que fuí a verlo". La actuación de Quiñones de la Rosa ante el inminente peligro que le surgió, con tres segundos solamente para conjurarlo, debe juzgarse a la luz de esas circunstancias. No creemos que en esa situación el hecho de que no se desviase a su derecha justifique imputarle negligencia. Su decisión en ese momento de extremo peligro no podía ser producto de una reflexión razonada. Necesariamente fue una reacción instintiva, de alejarse del Plymouth posiblemente asumiendo que éste continuaría en el carril por el cual avanzaba rápidamente, o que lograría pasarle por la izquierda, y quizás, por-

que su instinto de conservación le indujo a exponer al posible impacto el lado del Pontiac más lejos de donde él estaba sentado. Podía no ser la que resultase más prudente y juiciosa y la que con más probabilidad hubiera evitado el accidente. Concluimos que su reacción fue la que podía razonablemente esperarse de un conductor prudente bajo circunstancias similares.

En *Jones* v. *Continental Casualty Co. of Chicago, Ill.,* 169 So.2d 50, 59 (La. 1964), las circunstancias que dieron lugar al accidente son muy parecidas al caso que nos ocupa. En *Jones*, supra, el conductor de un camión vio saliendo de una curva, como a 1,000 pies de distancia un Chevrolet que se dirigía a gran velocidad en dirección opuesta a la suya. Notó como a 600 pies que avanzaba por el carril en que él se dirigía; desvió el camión poco a poco a la izquierda y redujo la velocidad. El Chevrolet siguió por su izquierda. El conductor del camión creyó que no tenía alternativa, pues al desviarse a la derecha lo podía impactar por el lado y hacerle perder el control del camión; que al desviarse a la izquierda trataba de ir por el lado del otro. El choque ocurrió al volver el Chevrolet a su propio carril. Bajo estas circunstancias concluyó el tribunal que el conductor del camión se confrontó con una súbita emergencia y que no contribuyó al inminente peligro con que se confrontaba al desviarse a su izquierda; que no ejerció el mejor juicio pero no fue culpable de negligencia por el solo hecho que erró al escoger un método de escapar de un peligro que no surgió por su culpa y sí por la negligencia de otro. Véase, además, *Smith* v. *Smith,* 176 So.2d 231 (La. App. 1965).

En *Forgy* v. *Schwartz,* 136 S.E.2d 668 (N.C. 1964), se resolvió que cuando el conductor de un automóvil se confronta con otro que se le acerca a 60 millas por hora y como a 750 pies de distancia éste se desvía al carril por el cual aquél se dirigía de manera que sólo tenía 5 segundos para resolver qué hacer, tal situación crea tal excitación y anticipación

de un desenlace fatal en una persona prudente que puede paralizar sus reacciones y hacer que incurra en un error de juicio. Véase, además, *Vreugdenhil* v. *Krunkel,* 127 N.W.2d 630 (Iowa 1964).

■ La doctrina de la emergencia súbita ha sido adoptada en esta jurisdicción. *Banchs* v. *Colón,* 89 D.P.R. 481 (1963); *De Jesús* v. *Ayende,* 32 D.P.R. 439, 444 (1923). Cf. *Ortiz* v. *Autoridad de Transporte,* 80 D.P.R. 233 (1958); *Matos* v. *Pabón,* 63 D.P.R. 890, 900 (1944). Se aplica generalmente en situaciones como en el caso ante nos. *Cupp* v. *State,* 143 S.E.2d 197 (Ga. App. 1965); *Grisamore* v. *Atchison,* 403 P.2d 93 (Kan. 1965); *McMorris* v. *Hanover Ins. Co.,* 175 So.2d 697 (La. App. 1965); *Curtis* v. *Blacklaw,* 403 P.2d 358 (Wash. 1965).

■ Del análisis anterior resulta evidente que el accidente en cuestión se debió exclusivamente a la negligencia de Rivera Cintrón, el conductor del Plymouth al conducirlo a velocidad excesiva e indebidamente por su izquierda. *Vargas* v. *Alers,* 69 D.P.R. 231 (1948); *Pfaffenbach* v. *White Plains Express Corp.,* 34 U.S.L. Week (N.Y. Mar. 24, 1966). El propósito de diversión y las actuaciones de los ocupantes del Plymouth antes del accidente dan base adicional para la conclusión de que Rivera Cintrón conducía dicho vehículo en ese momento descuidadamente y no con la atención requerida por lo avanzado de la noche, el crecido número de personas en el vehículo y la intersección a que se acercaban por una semicurva. En vista de la súbita emergencia con que se confrontó Quiñones de la Rosa, éste no fue negligente al desviarse a su izquierda para evitar el accidente en cuestión.

*Por las razones expuestas, se modificará la sentencia en este caso declarando sin lugar la demanda y aumentando a su determinación original de $3,000 los daños reclamados por Nelson Quiñones de la Rosa en su reconvención, que el recurrente-recurrido Juan Rivera Cintrón debe resarcirle. Así modificada se confirmará.*