MIGUEL VELÁZQUEZ LOZADA y ANA DELIA MARTÍNEZ, por sí y como Co-Administradores de la Sociedad Legal de Gananciales, demandantes y recurridos, *v.* PONCE ASPHALT, INC. y AMERICAN INTERNATIONAL INSURANCE COMPANY OF PUERTO RICO, demandados y recurrentes.

*Número:* R-80-414     *Resuelto:* 28 de mayo de 1982

40

*Francisco J. Colón Pagán, Charles A. Cordero* y *Sigrid López González,* abogados de los recurrentes; *Israel Delgado Ramos,* abogado de los recurridos.

El Juez Asociado Señor Dávila emitió la opinión del Tribunal.

Miguel Velázquez Lozada conducía su automóvil por la carretera número 183. Chocó con una máquina de asfaltar carreteras perteneciente a la Ponce Asphalt, Inc. Sufrió fractura de la cadera y serias lesiones en la pierna y rodilla izquierda. Presentó demanda para resarcirse. Se declaró con lugar. El demandado ha recurrido cuestionando las determinaciones de hecho y conclusiones de derecho del tribunal de instancia. Las transcribimos a continuación.

1. Luego de finalizar las labores del día que venían realizando en la carretera número 183 que conduce de Las Piedras a San Lorenzo los empleados de la Ponce Asphalt estacionaron en dicha carretera alrededor de las 8:00 de la noche del viernes 3 de marzo de 1978 una máquina asfaltadora de un gran tamaño, con un ancho de 10 pies y de un peso de varias toneladas en el carril izquierdo en dirección de norte a sur, es decir de Las Piedras hacia San Lorenzo.

2. La máquina estaba totalmente desprovista —por aceptación de la propia parte demandada— de luces, vallas, rótulos o avisos de clase alguna que indicara a los automovilistas dónde se encontraba estacionada especialmente durante horas de la noche.

3. Las condiciones de la carretera no eran las mejores. Existían hoyos de distintos tamaños que se pueden ver claramente en las fotografías sometidas en evidencia. Varias semanas antes una compañía constructora (Las Piedras Construction) estaba instalando una tubería.

4. El alumbrado público en el sector no estaba funcionando desde semanas antes.

5. La máquina fue estacionada de forma tal que ocupaba de 4 a 5 pies de la vía de rodaje haciendo imperativo que los vehículos que discurrían de sur a norte —de San Lorenzo a Las Piedras— tuvieran que detenerse cuando venían vehículos en dirección opuesta y desviarse hacia su izquierda para poder continuar la marcha. La carretera no estaba dividida por una línea de centro.

6. La noche siguiente, sábado 4 de marzo de 1978, alrededor de las 11:00 Miguel Velázquez Lozada conducía el automóvil de su propiedad Volkswagen, Modelo 1972 por dicha carretera. Se dirigía hacia su hogar en el Barrio Tejas de Las Piedras. Cuando se proponía pasar por el área donde estaba estacionada la asfaltadora, se encontró con un vehículo de motor que venía en dirección contraria, con las luces altas, que repentinamente se desvió hacia su carril haciendo necesario que Miguel tuviese que girar su vehículo hacia la izquierda para evitar la colisión entre ambos vehículos. Desgraciadamente se encontró con la máquina asfaltadora que le imposibilitó pasar libremente por el carril de la izquierda. Miguel no pudo girar hacia la derecha porque impactaba un poste del alumbrado eléctrico que allí se encontraba. El Volkswagen, a pesar del impacto, se mantuvo en el área de rodaje.

7. Aunque las circunstancias en que ocurrió el accidente hacía imperativo que Miguel reaccionara en la forma que lo hizo, desviándose hacia la izquierda en vez de a la derecha, sin tampoco poder detenerse porque chocaba de frente con el vehículo que venía en dirección contraria, el Tribunal estima que Miguel fue negligente en un 15% por razón de que iba a una velocidad de 35 millas por hora cuando en dicho sitio, por ser zona urbana, debió conducir a una velocidad máxima de 25. A nuestro juicio, ello contribuyó a la ocurrencia del accidente y consecuentemente en la magnitud de los daños.

8. La prueba testifical y las fotografías sometidas en evidencia demostraron que muy cerca del sitio donde los empleados de la Ponce Asphalt estacionaron la máquina asfaltadora se encontraba disponible el área de estacionamiento del Supermercado Bueno donde pudo haberse estacionado la máquina fuera de la vía de rodaje sin crear una situación de inseguridad en el libre fluir del tránsito.

9. Para la fecha del accidente la co-demandada Ponce Asphalt estaba asegurada mediante póliza en vigor con la co-demandada American International Insurance Co. para cubrir daños como los ocasionados en este caso.

10. Para la fecha del accidente Miguel contaba con 27 años de edad. Había contraído matrimonio con Ana Delia Martínez desde 1973. Tenía dos hijos de nombre Ivette y Juan Miguel de 2 y un año de edad respectivamente. Su esposa se encontraba embarazada. Para la vista del caso ya había dado a luz una niña a quien nombraron Dessenia. Miguel se desempeñaba como auxiliar de carpintero devengando un salario semanal [de $110].

11. Al momento del accidente quedó inconsciente. Fue auxiliado por el Policía Pablo Vázquez y otras personas que lo llevaron al Hospital Municipal de Las Piedras y de aquí fue trasladado inmediatamente al Hospital Ryder de Humacao donde luego de ser evaluado por el Dr. Huberto Díaz Negrón fue hospitalizado para ser intervenido quirúrgicamente. Según el Dr. Díaz Negrón, al llegar al Hospital Ryder, Miguel se encontraba en malas condiciones, adolorido, con "distress" agudo, muy inquieto aunque estaba coherente. Tenía una contusión y deformidad en el aspecto lateral del muslo izquierdo. Se diagnosticó fractura del fémur izquierdo a nivel subtrocantérico (tercio medio del fémur a dos y media pulgada[s] de la articulación de la cadera). Se le inmovilizó la fractura con tracción. Estaba obligado a permanecer acostado hacia arriba ya que cualquier movimiento de los huesos aumentaba el dolor. Así estuvo desde el 5 de marzo a las 2:30 de la mañana hasta el 8 de marzo [de 1978]. Se le suministraron analgésicos y narcóticos. El 8 de marzo, cuando su condición era más estable fue intervenido quirúrgicamente. . . . Estuvo incapacitado totalmente para desempeñar sus funciones y proveerse sus ingresos hasta el 1ro. de marzo de 1979.

12. Después de ser dado de alta el Dr. Díaz Negrón continuó tratando a Miguel como paciente ambulatorio viéndolo en visitas de seguimiento en marzo 25, abril 28, junio 24, agosto 14, 19 de agosto, octubre 21 y diciembre 30 de 1978. Durante ese período post-operatorio Miguel estuvo usando muletas para su ambulación y recibiendo fisioterapia. El 23 de agosto de 1979 el Dr. Díaz Negrón volvió a hacerle una evaluación médica a Miguel y éste le manifestó "que todavía

cogea [*sic*] al caminar, así como [que siente] dolor en la cadera izquierda. También nos refiere episodios de inestabilidad de la rodilla". El informe de dicha evaluación constituye el Exhibit II de la parte demandante de donde surgen los siguientes hallazgos:

.     .     .     .     .     .     .     .

"1. Hay cortedad de la pierna izquierda al ser comparada con la derecha en media pulgada.

2. Hay cicatriz de una pulgada en la nalga izquierda con atrofia difusa de ésta.

3. La cadera tiene arco de movimiento completo pero con dolor en la abducción estando debilitada.

4. Hay dolor a la palpación del Trocánter mayor izquierdo.

5. El muslo izquierdo tiene cicatriz quirúrgica de alrededor de 8 pulgadas y media (8 1/2") en su aspecto lateral, así como atrofia de pulgada y media al ser comparada con el lado sano.

6. La rodilla tiene arco de movimiento completo sin efusión, pero se aprecia debilidad del músculo cuadricep al ser comparado con el lado sano. . . .

Diagnóstico:

1. Fractura consolidada, región subtrocantérica del fémur izquierdo con clavo intramedular.

2. Atrofia de la nalga secundaria al diagnóstico número 1.

3. Bursitis crónica Trocánter mayor secundaria a la presencia del clavo.

4. Inestabilidad de la rodilla secundaria a debilidad y atrofia del cuadricep.

5. Cicatrices quirúrgicas en nalga y muslo derecho.

Comentarios:

La condición de este paciente es la que era de esperarse después de un traumatismo tan grave como una fractura de Fémur.

Tendrá limitación permanente de su pierna afecta y posiblemente necesitará cirugía para remoción del clavo afecto para aliviar la condición de la Bursitis de cadera, pero ésto no le mejorará la condición funcional de la rodilla debido a la debilidad del cuadricep."

13. A la fecha de la vista del caso, el Dr. Huberto Díaz Negrón, único perito cuyo testimonio se ofreció, estimó la

incapacidad de Miguel en un Treinticinco (35) por ciento de las funciones fisiológicas generales.

14. Con motivo del accidente la sociedad de gananciales compuesta por Miguel Velázquez Lozada y Ana Delia Martínez sufrió la pérdida total del automóvil Volkswagen, Modelo 1972 en el cual habían invertido la cantidad de $640.00.

15. En enero de 1979 Miguel fue dado de alta por la Administración de Compensaciones de Accidentes de Automóviles (ACAA) para poder trabajar. Recibió de dicha agencia la cantidad de $2,200.00 a razón de $55.00 semanales por un período de 40 semanas. Estimamos en $8,058.00 el lucro cesante de Miguel computado desde la fecha del accidente, el 5 de marzo de 1978 hasta el 26 de septiembre de 1979 en que se celebró la vista del caso, a razón de $102.00 semanales. Desconta[do de ] esta cantidad lo que recibió de la ACAA —$2,200.00— nos da un lucro cesante pretérito neto de $5,858.00.

16. Según antes se ha indicado, para la fecha de la ocurrencia del accidente Miguel Velázquez Lozada contaba con 27 años de edad. De acuerdo a la tabla de vida abreviada para varones editada por el Departamento de Salud de Puerto Rico, el lesionado cuenta con una expectativa de vida de 48 años. Conforme a la Administración del Seguro Social Federal, la vida productiva de los varones llega hasta la edad de 65 años. Para el 26 de septiembre de 1979, fecha de la vista del caso en sus méritos, el lesionado contaba con 28 años de edad. Tomando como base esta fecha, la vida productiva de Miguel sería de 37 años (65–28).

Por las razones que se indican en las conclusiones de derecho que se formulan más adelante, se estima en $22,989.72 el lucro cesante futuro de Miguel Velázquez Lozada con motivo de la incapacidad de un 35% de las funciones fisiológicas generales.

17. Las partes estipularon que la co-demandante Ana Delia Martínez experimentó los sufrimientos y angustias mentales que normalmente experimenta una esposa con motivo de los daños físicos y sufrimientos mentales por los que atravesara su esposo, tomando en consideración que a la sazón contaba con tres meses de embarazo y con dos hijos de las edades que se han mencionado. El Tribunal estima en $3,500.00 los daños de ésta.

18. La prueba no estableció que los menores Ivette y Juan

Miguel Velázquez Martínez sufrieran daños con motivo del accidente. De todas maneras se estima que a su corta edad, 2 y un año de edad respectivamente, no tenían suficiente discernimiento para comprender los episodios traumáticos por los que pasaron sus padres.

Como primer error alega el demandado que no fue negligente y que no existió un nexo causal entre su negligencia y los daños sufridos por los demandantes. La evidencia demostró, y el tribunal de instancia determinó, que la máquina asfaltadora de un ancho de diez (10) pies estaba estacionada ocupando de cuatro a cinco pies de vía de rodaje, que dicha máquina estaba totalmente desprovista de luces, vallas, rótulos o aviso de clase alguna. El accidente ocurrió de noche y el alumbrado público estaba defectuoso. La Sec. 5-709 de la Ley Núm. 141 de Julio 20, 1960 (9 L.P.R.A. sec. 1021) dispone:

> (a) Ninguna persona podrá estacionar de noche un vehículo en una vía pública, cuando la misma careciere de alumbrado público, y dicho vehículo tuviere sin encender sus luces de estacionamiento, y sus luces posteriores y cualesquiera otras luces que exigiere para dicho fin el Secretario y por virtud de las disposiciones de este Capítulo y sus reglamentos.

En varias ocasiones hemos dicho que en una acción de daños la violación de una ley o reglamento no constituye fundamento por sí solo, en ausencia de demostración de causalidad entre el daño y la violación a la ley o reglamento. Ver *Sáez* v. *Municipio de Ponce*, 84 D.P.R. 535, 540 (1962); *Jarabo* v. *Ramírez de Arellano*, 93 D.P.R. 709, 718 (1966). Para determinar si se cumple con el requisito de causalidad, debe demostrarse que la actuación del demandado fue la causa próxima o eficiente de los daños causados. Hay que examinar si el acto negligente aparece como causa probable y ordinaria del daño y determinar si era probable que el daño ocurriera a causa del acto negligente del demandado. Ver *Estremera* v. *Inmobiliaria Rac, Inc.*, 109 D.P.R. 852 (1980); *Valle* v. *Amer. Inter. Ins. Co.*, 108

D.P.R. 692 (1979); *Soc. de Gananciales* v. *Jerónimo Corp.*, 103 D.P.R. 127 (1974). En este caso es evidente que se cometió un acto negligente que fue la causa del accidente en cuestión. El haber estacionado la máquina de asfaltar, que ocupaba parte de la vía de rodaje, durante la noche, sin luces, ni rótulos, constituyó el acto negligente que causó el accidente. El vehículo de motor que invadió el carril del demandante se vio obligado a ello porque la máquina asfaltadora ocupaba su carril. El demandante tuvo que desviar su carro al lado izquierdo para evitar el accidente inminente. No desvió su automóvil hacia el lado derecho porque había un poste de luz eléctrica en ese lado. Trató de salvar la situación desviándose hacia el lado izquierdo, pero chocó con la máquina de asfaltar. No se cometió el primer error.

Como segundo error, señala el recurrente que cometió error el tribunal de instancia al aplicar la doctrina de emergencia súbita para exonerar parcialmente la conducta negligente del demandante. Como bien señala el recurrente, en esta jurisdicción sólo se ha aplicado la doctrina de emergencia súbita en casos en que la parte que la solicita no ha incurrido en ningún grado de negligencia. Ver, *Matos* v. *Pabón*, 63 D.P.R. 890 (1944); *Ortiz* v. *Autoridad de Transporte*, 80 D.P.R. 233 (1958); *Santos Rivera* v. *Quiñones De la Rosa*, 93 D.P.R. 491 (1966); *Ruiz Adames* v. *Insurance Co. of P. R.*, 95 D.P.R. 424 (1967).

La doctrina de emergencia súbita se ha aplicado a casos de negligencia de accidentes de vehículos de motor de la misma forma que la doctrina se ha aplicado a otro tipo de casos de negligencia. La misma regla básica es aplicable cuando se trata de la negligencia del demandado o de la negligencia contribuyente del demandante. En algunas jurisdicciones de los Estados Unidos se ha establecido que los requisitos básicos para que proceda son: (1) que la parte que la invoca no haya incurrido en negligencia que contribuya a la creación de la emergencia súbita, (2) que el

tiempo transcurrido haya sido suficientemente corto para que excluya la posibilidad de una decisión inteligente y deliberada, y (3) que la actuación negligente requiera control y manejo, *Personal Injury Actions—Defenses, Damages*, Mathew Bender, 1975, Vol. 1B, Sec. 1.06, pág. 121.

En el caso de autos se cumplen los dos últimos. Pero el incumplimiento del primer requisito en Puerto Rico no impide que el demandante tenga derecho a invocar la doctrina de emergencia súbita. En las jurisdicciones donde impera la doctrina de negligencia contribuyente, cuando se prueba algún grado de negligencia de parte del demandante, éste está impedido de ser resarcido. Asimismo, en estas jurisdicciones la parte que solicita la defensa de emergencia súbita tiene que estar libre de negligencia para poder reclamarla, *Hicks* v. *B & B Distributors*, 91 N.W.2d 882 (Mich. 1958); *Smith* v. *Steadman*, 304 P.2d 553 (Kansas 1956); *Grinstead* v. *Krushklov*, 39 Cal. Reptr. 812 (1964).

Conforme a la doctrina de negligencia comparada, la negligencia contribuyente del demandante atenúa la responsabilidad. H. Brau, *Los Daños y Perjuicios Extracontractuales en Puerto Rico*, Publicaciones J.T.S., Inc., Vol. 1, Sec. 7-92; Art. 1802, Código Civil; *Ramos* v. *Carlo*, 85 D.P.R. 353 (1962); *Prieto* v. *Maryland Casualty Co.*, 98 D.P.R. 594 (1970); *Montero Saldaña* v. *Amer. Motors Corp.*, 107 D.P.R. 452 (1978); *Publio Díaz* v. *E. L. A.*, 106 D.P.R. 854 (1978); *Méndez Purcell* v. *A.F.F.*, 110 D.P.R. 130 (1980).

█ Para determinar la negligencia que corresponde a cada parte, en casos de negligencia comparada es necesario analizar y considerar todos los hechos y circunstancias que mediaron en cada caso y cuál fue la causa predominante. En este caso, el tribunal de instancia determinó que el demandante incurrió en un 15% de negligencia por conducir a exceso de velocidad. Este hecho no imposibilita que se aplique la doctrina de emergencia súbita. En Puerto Rico,

la persona que haya actuado con prudencia dentro de una situación de emergencia súbita, no previsible, podrá invocar la defensa aunque haya incurrido en negligencia contribuyente. No se cometió el segundo error.

■ Como tercer error señala que el tribunal de instancia no debió permitir que el perito médico opinara sobre el porcentaje de incapacidad. El doctor Díaz Negrón declaró que operó al demandante y que luego de darle de alta del hospital lo tuvo bajo tratamiento en calidad de paciente ambulatorio. Estaba calificado para opinar sobre el porcentaje de incapacidad. Además, un tribunal, con base a la prueba presentada puede llegar a su propia conclusión y no está obligado a seguir la opinión de un perito facultativo. *Zambrana* v. *Hospital Santo Asilo de Damas*, 109 D.P.R. 517 (1980), y casos citados allí.

Como cuarto error el recurrente objeta la concesión de lucro cesante por entender que la pérdida de ingresos pretérita y futura es consecuencia de la crisis económica prevaleciente en Puerto Rico.

El lucro cesante se trata de un perjuicio sufrido que consiste en una ganancia futura frustrada que con cierta probabilidad era de esperar según el curso normal, ulterior de las cosas. El perjudicado no tiene que demostrar con certeza absoluta que se habrían realizado las ganancias. Para distinguir entre un interés verdadero y uno inseguro o incierto, hay que distinguir entre la mera posibilidad y la probabilidad de una ganancia futura teniendo en cuenta que tal vez en algún caso sea indemnizable la mera posibilidad, Santos Briz, *Derecho de Daños*, Madrid, Ed. Revista de Derecho Privado, 1963, pág. 241.

■ El problema de la determinación del lucro cesante presenta una doctrina común a la culpa contractual y a la extracontractual, de modo que todos los principios fundamentales son aplicables a ambos. Santos Briz, *La Responsabilidad Civil*, 2da ed., Ed. Montecorvo, S.A., 1977, pág. 229. En la sentencia núm. 67, del 30 de junio de 1924, el Tribu-

nal Supremo de España decidió que no era de estimar infracción al Art. 1902 (responsabilidad por daños extra-contractuales) ni al Art. 1106 (responsabilidad por daños contractuales) porque la mera posibilidad de haberse podido dedicar una persona al ejercicio de una industria sin actos que determinen cuando menos el propósito ostensible y deliberado de su ejercicio efectivo, no ofrece base jurídica para una condena de indemnización de perjuicios, derivada de una hipotética lesión de derechos cuya virtualidad o causa inicial no se justificó en forma. En el caso de autos, no estamos ante un caso de mera posibilidad de ganancia futura. Existe prueba de actos que demuestran no sólo el propósito sino la realidad de que el demandante se dedicaba a un oficio que le producía un determinado ingreso o ganancia. Existía la probabilidad de que durante el resto de su vida hubiera seguido desempeñándose en ese oficio y percibiendo esa ganancia. Sin embargo, como resultado del accidente sufrió incapacidad parcial permanente de 35% que tuvo como consecuencia una merma en su capacidad productiva, y por lo tanto en ganancias, pues no podía volver a desempeñar su anterior oficio. Tiene derecho a ser compensado por las ganancias que no recibirá como consecuencia del accidente.

En la vista del caso el doctor Díaz Negrón estimó la incapacidad de Miguel en treinticinco (35) por ciento de las funciones fisiológicas generales. El tribunal de instancia llegó a la conclusión de que a base de la prueba desfilada el perjudicado no pudo volver a desempeñar su anterior trabajo de construcción.

A la fecha de la vista del caso estaba gestionando un trabajo de conserje a través del Plan CETA, por el que devengaría un sueldo de $80 semanales. A base de la diferencia del sueldo de $80 semanales y el sueldo anterior de $110 semanales, se hizo el cómputo para determinar que el lucro cesante futuro sería de $30 semanales. En *Publio Díaz v. E.L.A.*, supra, pág. 871, dijimos: "La razonabilidad de la

cuantía total no puede hacerse depender de unos cómputos aritméticos, que en fin de cuentas se elaboran sobre unas bases y expectativas, que aunque precisables no están inmunes de cierto grado de especulación." Ver además, *Suro* v. *E.L.A.*, 111 D.P.R. 456 (1981). No se cometió el error.

Como último error alega el recurrente que el tribunal erró en la apreciación de la prueba y en darle crédito al testimonio de la parte demandante. El error alegado es totalmente inmeritorio. En repetidas ocasiones hemos dicho que "[n]o tenemos base para intervenir con la apreciación de la prueba que hizo el tribunal de instancia en ausencia de pasión, prejuicio, error manifiesto o parcialidad", *Pueblo* v. *Turner Goodman*, 110 D.P.R. 734, 738 (1981); *Pueblo* v. *Franceschini Sáez*, 110 D.P.R. 794, 796 (1981); *Pueblo* v. *Torres Montañez*, 106 D.P.R. 125, 130–131 (1977).

Por lo anteriormente expuesto *se confirmará la sentencia apelada.*